Oral argument not to exceed 15 minutes per side, Ms. Payoff for the appellant. Good afternoon, your honors. My name is Kira Payoff and I represent the plaintiff appellant Mary Helfrich in this case. And she's a 64-year-old former employee of the defendant, Appley, NWO. If I may, I'd like to reserve three minutes for rebuttal. Thank you. I'm here to ask that the district court's grant of summary judgment in this case be overturned. Ms. Helfrich established genuine issues of material fact with respect to NWO's proffered reason for her termination. In granting summary judgment, the district court failed to draw all inferences in Ms. Helfrich's favor. And in fact, improperly drew some inferences against her and in NWO's favor. And the court credited the testimony of Ms. Helfrich's supervisor, Ms. Neely, who's a convicted felon who stole $72,000 from her church. And the court credited self-serving conclusory statements in declarations rather than crediting Ms. Helfrich's testimony in her deposition and the depositions of defendant's witnesses. In granting summary judgment to defendant, the court also credited NWO's counsel's characterization of various emails that it claims somehow is conclusory evidence that there was a year-long performance problem with Ms. Helfrich. When you look at the emails themselves, they show that they were not all directed to Ms. Helfrich individually. And in fact, some of them are directed to her supervisor, Ms. Neely, and talk about just the general division of duties in the department. Ms. Miller, who's the administrator, acknowledged in her deposition that the emails were the sort of emails that supervisors send on a day-in and day-out basis to subordinate employees saying, here's the task that I want performed, here's the priority I think you should do them in. And they're not evidence of any performance issues or disciplinary action. And when you compare them to emails of one of Ms. Helfrich's coworkers, Ms. Azaroff, the emails about Ms. Azaroff are between supervisors talking about the actual performance issues that they have with her job and how they're going to remedy that situation and talk to Ms. Azaroff about it. And the emails about Ms. Helfrich, there aren't similar emails showing, hey, we've talked to her over and over and over again. I mean, you would acknowledge that the matter is before the court on summary judgment, right? Yes. And so we know the standard for granting summary judgment.  testimony, looked at the exhibits, looked at the package, led the court then to issue an opinion where it broke down the various, you know, the standard for deciding this case. And where particularly do you quarrel with the court's analysis? Well, in terms of the court finding that there was, that Ms. Helfrich hasn't established an issue of fact that defendant's proffered reason had, there's an actual basis for it. The court simply just latched on to. Going to the very bottom line, which, you know, we go step, step, step, and then we finally, then it's your client's burden to show that the reasons advanced by her employer are pretextual. Correct. Okay, so you're going to focus there, and that's where you should, I think. Yeah. Okay. In this case, the court latched on to defendant's characterization, actually the counsel's characterization of the e-mails as definitive evidence that there were performance problems. So was there anybody with performance problems for as long as she had? Because that's one way to show pretext. You know, you had someone just like this, and for whatever reason they didn't discipline the person, and then your client's disciplined. As I understand the case, your comparators are people that had come on pretty recently and the performance problems hadn't lingered as long. Well, with respect to the comments I've been making, I'm focusing on the first method of pretext, which is there's no factual basis. We dispute that there was a year-long performance issue and that there's no evidence of having a year-long performance issue. But going to comparators, it's ‑‑ Well, I mean, you think there was nothing? Her performance was just as good as anyone else's? That's your view? Well, I think she was performing her job duty adequately and that they admitted ‑‑ You think the 30-day warning was unjustified? Yes. Ms. Neely admitted that the factors underlying ‑‑ Some of the things, but I mean, you're saying everything was ‑‑ she was as good as everybody else is your basic theory. Well, there's no evidence of these some other things that Ms. Neely put in her declaration that form the basis of the 30-day warning. The 30-day warning, she admitted, was based on false pretenses. I don't think that was the ‑‑ is that a quote? Not from her, but she admitted that the factors were negated or that they didn't exist. I thought it was that some of the things were proved not to be true, but I also thought the testimony showed that many of the problems that predated the 30-day warning existed after the 30-day warning. Well, in her declaration, she added the additional thing that there were ‑‑ that the 30-day warning stood because there were additional problems, but there was not any proof of that. Was it required to be proof of that at that stage? Well, Ms. Helfrich disputes that there were any performance problems, and at this stage, there's reasonable inference the jury can draw that there are no performance problems, let alone a year‑long performance issue. Okay, so what about delinquent assignments and unapproved overtime after the warning period was up? Is your point that she's denying that happened, or what's your point there? As to the delinquent assignments, I think you're talking about a stack of papers that they found after they fired her, which she didn't get to on the day that they fired her. That removed them from their essential character as delinquent? The fact that she didn't get to them, doesn't that prove that they were delinquent? Well, they're her daily assignments, and so she hadn't got to them that day by the time that they fired her. Had they waited to the end of the day, there probably wouldn't be the stack of delinquent assignments, but we don't know because they fired her. And your understanding is that the stack was only that day's worth of stuff? Yes. And then how about unapproved overtime? On the unapproved overtime, if you look at the emails prior, it talks about having them come in on the weekends and work together on overtime to catch up on some of the backlog that's not due to Ms. Halfridge, but because of the fact that, you know, the younger employees weren't working out and other things weren't being done. The word is unapproved. I'm not saying there wasn't overtime. Isn't the key word unapproved? Well, I think we dispute the fact that there's unapproved overtime in this case. Is there evidence of the record that shows that you presented evidence that was contrary to that or that contradicted it so as to create a genuine issue of material fact? Well, as to the unapproved overtime, there's no evidence that they ever discussed it with her or told her not to work overtime and, in fact, told her to work overtime. So I think in terms of the – No, my question is slightly different. I didn't find any, but was there any evidence in the record that the overtime was approved? No, there's no email or anything. You didn't present any evidence that it was approved? Correct, Your Honor. So there's no genuine issue of material fact on that point, right? Well, Ms. Halfridge disputes that it was unapproved. I mean, there's nothing that – You can't dispute it in briefs. You have to dispute it with facts. I understand that, but what we don't have is an email saying, I need to work overtime. There's background that says we're working overtime to do all of these things, and so there's an inference that it was approved. There's nothing in writing that explicitly states it was approved overtime. Who's that email from or that evidence from that we're working overtime to – It's one of the emails – I can get you the exact site, but I believe it's one of the emails from May of 2011, just a month and a half or two months before. Now, as to the other point Judge Sutton brought up, in terms of the comparators, in this case they're trying to distinguish Ms. Azaroff from Ms. Halfridge because she's in some sort of probationary period. As an initial point, she was already out of her probationary period when you look at the time record. She had been there past 90 days. But there's also nothing written about this policy of allowing probationary employees more leniency in the ability to transfer versus long-term employees. But also common sense tells us that the manner and way businesses operate is they have probationary employees so that if they don't work out, they can just get rid of them. Companies would want to keep longer-term employees, and so for them to say that it's okay that we treated Ms. Azaroff, who's 40 years younger, better. You used the word common sense. I was just about to interject the same phrase in exactly the opposite direction. It seems really common sense to me that, yes, it's true. Probation allows you to dismiss somebody after six months. But it's not unusual to have more mistakes when you start a job. But if they're lingering for four years, that seems like a very different setting. You start to wonder how you train this person to do the job effectively. In this case, even NWO doesn't claim that performance problems were lingering for four years for Ms. Helfrich. She had a wonderful employment record up until the point where Ms. Miller hires a significantly younger employee, Ms. Helfrich trains her, and then she's automatically promoted to her supervisor. But if you look at, compare the emails about Ms. Azaroff, she's doing the same mistakes over and over and over again and refusing to perform the tasks that are being asked of her over and over again. And when you compare that to the emails that NWO points to, it's not the same kind of thing. They're nitpicking. There's an hour of what they call unapproved overtime, which we dispute. Do you have a case that says it's the kind of comparator that will establish a tribal issue of fact over pretext? One person's on probation, the other person's been there for several years? Well, in Ms. Azaroff's situation, again, she wasn't on probation, but if you look at the case law with Mitchell and Martin, they don't have to be exact correlations. Ms. Azaroff and Ms. Helfrich were under the same supervisor. They were in overall the same department where they were working, and they were performing similar job duties. Ms. Helfrich would help out in front reception occasionally during employment. Is there any significance to the fact that the majority of the nine involuntary dismissals, I believe during the year 2011, were younger than 40 in discussing the comparators? In terms of the nine involuntary dismissals, that's just a conclusory statement and a declaration. We don't have any information as to who they're claiming were involuntary or what the reasons were, or even if they were in the same department. The panel then should disregard that. In terms of evaluating what they claim is undisputed hiring practices that are not discriminatory, yes, because there's nothing that supports that assertion. It's just a conclusory assertion, and they're not comparing similarly situated employees. They're not even talking about the same department. I see red lights on, so thank you. Mr. Flom. Thank you, Your Honor. Justin Flam on behalf of Defendant Appalee Northwest Ohio Orthopedics and Sports Medicine, Inc., commonly referred to as NWO for shorthand. I would submit that when you look at the record evidence and you stick to the record evidence, that this is a very straightforward case. The only point at which it gets more complicated is if one takes up Mary Helfrich's invitation to look at some of the theories that she has asserted. And to one of your questions, Judge Sutton, to plaintiff's counsel, it is an issue of points being argued on brief that are not supported by the record at hand here. So what's your response? I mean, she's making the point that, you know, on the reasonable belief, there are no facts that show that she was performing poorly, that the 30-day warning, there's an acknowledgment that some of the reasons for it were not legitimate reasons or had been corrected reasons. So walk us through. What are the things before and after the 30-day warning that are in the record and not disputed? Certainly. And the district court mentioned a few of these. The district court did not cover all of these issues. However, if you go back to August 2010, that's when the counseling first begins, as shown in the record here. There's an email about keeping up with the dictation that had to be done so that the medical practices and medical records were up to date. You move from that... ...upon the new supervisor taking over, that the tenor of the evaluation of Ms. Helfrich changed. That's correct. There was a new supervisor around that time. The issue that they have tried to argue here and have really just alluded to it by incorporating some arguments from the briefs below is a cat's-paw type argument. The problem from that argument is that there is no evidence whatsoever that Shelley Neely, the supervisor at issue, harbored any age-based animus or any animus of any kind toward Ms. Helfrich personally. That is absolutely missing from the record. So the notion that we had a change in the supervisor... Can we make inferences, though, even in the absence of direct evidence? You can make inferences, Your Honor, and the plaintiff in a summary judgment motion filed by defendant is entitled to those inferences. There still need to be facts driving those inferences, however. Ms. Neely hired Ms. Ackeroff, didn't she? She was involved in that hiring, yes, Your Honor. She didn't make the hiring decision? She doesn't have the direct authority to hire, Your Honor. She made the recommendation, did she? She was one of the persons who recommended that hire, yes, sir. Back to your question, Judge Sutton, some other issues that came up. The performance evaluation in December of 2010 highlighted some problems with Ms. Helfrich's performance, some of the same types of things that continued through 2011. These were attention to detail, learning new tasks. Did Ms. Ackeroff have some of the same issues that persisted beyond the 30-day period that Ms. Helfrich had? Ms. Ackeroff had some of the issues that were of the same variety. They were different, and I would submit she is not a comparatory or not similarly situated because at the time those issues came up, she was working in a different department. She was up in the front reception dealing with patients, dealing with doctors. The undisputed evidence is that it's a highly stressful department to work in, the front. So she would be excused for some of her mistakes while Ms. Helfrich would not? No, Your Honor, but they are doing different roles, and they are in roles that is undisputed. Ms. Ackeroff testified it was less stressful to do the work in medical records, and it was less demanding. Paula Miller testified similarly that the front reception role was a very stressful job. So in terms of the standard that's applied there when you're dealing with patients, dealing with the variables you have there with the doctors who run the practice and the patients who come in, it's a very different situation than it is to be scanning a stack of papers that need to be in someone's medical records. But Ms. Ackeroff was not transferred out, or was she transferred out in light of these problems? She was eventually moved into the medical records role. That decision was made right before Ms. Helfrich's termination. When she went into medical records, didn't she have some of the same performance problems as did Ms. Helfrich? No, Your Honor. The evidence is that Ms. Helfrich would be counseled on things, would have a short period of improvement, and then would go back to the old problems again. There is no record evidence whatsoever about Claudia Ackeroff having any of those same problems, and no record evidence about any problems Ackeroff had in medical records. What do you call the same problems concretely? You said she's counseled, she has her warnings. Give me examples. Attention to detail, I think, Your Honor, was one of the things mentioned. There was an overtime issue mentioned in one of the emails with Ms. Ackeroff. So that's why I say in response to Judge Marbley's question that there were some superficial similarities there. But when you look at what they were doing, the roles they were in, and the amount of time that Ms. Ackeroff had worked there, as the district court noted, she had just come out of her probationary period. I'm asking Helfrich, what is it that she continued to do after counseling, after the warnings? Give us a concrete example. Certainly. Attention to detail issues, Your Honor, failing to keep up with scanning. Be a little more concrete. Attention to detail. May 2011, we're not keeping up with the scanning. April 2011, Shelley Neely, her supervisor, has to stay late to complete work that Mary Helfrich was supposed to have completed herself. February 2011, patient files ending up in the wrong charts. So Mr. Smith goes to his chart, and there's actually a record for Mr. Jones in there. Problems that go back to the issues mentioned. Paying attention to detail, keeping up with work, those types of things that are outlined in some of these emails. Some of the emails are directly to Ms. Helfrich. Some of the emails are between the two managers, Shelley Neely and Paula Miller, discussing the conversations that they've had, the steps that they've taken to address these issues with Ms. Helfrich. And your comment about the July issue that was discussed a little bit earlier in the plaintiff's argument, these were the unapproved overtime issues and the taking of shorter lunches than company policy required. And when that was addressed with Ms. Helfrich by Shelley Neely, she rolled her eyes. Your lunch being too short? Yes, Your Honor. That's actually a fairly common employer policy. You have to clock out for a certain amount of time, so it's an unpaid lunch period, and it's also a way to manage the overtime hours that the company wants to limit. The issues came to a head in September of 2011 when there was a complaint by a patient who had requested certain records that were not provided in response to the request because Ms. Helfrich failed to follow internal protocols for making sure that the records are handled the right way. That is undisputed. There is argument about whether or not that was some new process or not in the reply brief, but there is absolutely no evidence provided by Ms. Helfrich or pointed out by Ms. Helfrich from any of the NWO witnesses to suggest that it did not actually happen that way, as with the stack of unfinished work that was found just a few days later next to her workstation. She says that was just one day's worth of stuff. There's no evidence to say that, Your Honor. In the reply brief, there is an argument, and it's just an argument, and it only shows up in the reply. What does your evidence say? Our evidence says that there was a stack of unfinished work. This comes from Shelly Neely. Did anyone say it was more than one day's worth of work? That seems kind of funny to get in trouble for not finishing a day's worth of work when you're fired halfway through the day. It's unfinished work, Your Honor, so it's not unfinished unless it should have been done by that point in time. That was the concern that was raised when Shelly Neely found that. Literally, at what time was she fired? Do you recall? I don't know the time, and I'm not sure that's reflected with exact detail in the record, Your Honor. The overtime was she was suggesting that she was asked to do the overtime and making it seem like it was just a bureaucratic mistake in terms of whether you actually got approval or got approval before you submitted the overtime request. The notion is that she's saying, I need to keep up, and the bottom line from what the record shows here is that she wasn't keeping up with the job. Her answer was overtime. The company's position was we want to limit the overtime because there's a direct expense to NWO that comes with that. I take it that Mrs. Helfrich had enough time between the time she was discharged and the time you filed the motion for summary judgment to find out about the performance of the replacement in almost a year. Certainly, Your Honor. The replacement was actually, well, I strike that. We quibble with the question of whether it was a replacement or not. Whether she's a replacement or not, right. We can leave that to the side. Let's assume for a moment that we call her that. Ms. Azaroff was deposed by the plaintiff, and her performance was discussed at some length in that deposition that plaintiff's counsel took. So the opportunity was there. There also, of course, plenty of opportunity to take written discovery and look into the record to see if there is something to show that Claudia Azaroff had the same kind of pattern that Mary Helfrich did of working in medical records and having the same repeated problems that the record shows on an undisputed basis Mary Helfrich had. It is not a fact dispute that comes from the record. It is a characterization that comes from counsel, and this is in the briefs, and the argument is that only the April 2011 written warning should be considered discipline because that's the only one that looks like a formal document, that that's the only thing that we can look to then to count against Ms. Helfrich and that everything else should effectively be ignored by this court because it's not on a form and doesn't say discipline. But what you have is a record that shows both written communications to Ms. Helfrich about the performance issues. You have contemporary email exchanges between the two managers involved in this situation and in the termination, talking about these problems, memorializing near in time to discussions that were had with Ms. Helfrich about these very problems. None of that is disputed. So you will search the record in vain to try to find any evidence in which Ms. Helfrich says or points to an NWO witness where she can say this thing did not happen, this overtime issue did not happen, this unfinished work did not happen. All of those things are undisputed. Well, she argues that inferences can be drawn differently than you suggest they be drawn. Yes, Your Honor. We hear the term inference in the brief quite a bit. We heard it at oral argument. What I would submit is that they're not asking for inferences, they're asking for nullification of the NWO witnesses and they are affirmatively asking that NWO witnesses be discredited on summary judgment based on several things such as the background of one witness. So a witness has a criminal background. According to Ms. Helfrich's position, you should never believe anything that that witness says on summary judgment, even if there is zero evidence, as is the case here, to dispute that fact. The other argument we see is that the declarations submitted are supposedly attorney-drafted, even though there is no evidence in the record to that point. Regardless, though, there is no rule against attorneys being involved in the drafting of declarations. So the notion that she is requesting is not just an inference based on facts. It is wiping away the record evidence that is not disputed in this case. And it is based largely on the request that witnesses be discredited, which cannot be done on summary judgment. It is based largely... The way this works is the credibility problem arises only if they have some evidence on the other side. If they have some evidence, then all bets are off in terms of whether there is a disputed issue of fact. Yes, you're right. If they have no evidence, it doesn't matter how bad this person is. If they say something, we have to believe it. I believe that to be the case, Your Honor. The summary judgment stage is not the time to be making credibility determinations. The issue that they quibble with as to the witness, Shelley Neely, is a criminal charge that has nothing whatsoever to do with her employment at NWO, nothing whatsoever to do with any facts in this case. It's all established in Shelley Neely's deposition. You'll see questions from plaintiff's counsel in Shelley Neely's deposition implying that she's not an honest person because of that background. But when you look at Shelley Neely's declaration and look at the facts that she outlines, there is nothing elsewhere in the record that would negate that. Nor is there anything that would tar Shelley Neely with this taint of ageism or age-based animus that is pushed aggressively in the briefs. They make a cat's paw argument, but again, there is nothing to suggest that Shelley Neely had any problem with Mary Halfridge on a personal level or any problem with Ms. Halfridge's age or any problem with people in the protected age group in general. The comment made at oral argument was that Shelley Neely was a manager brought in who was substantially younger than Ms. Halfridge. That's true. But what they are effectively asking the court to find with that argument is that any time you have a younger manager supervising an older employee, an employee in the protected class, that we can infer age discrimination. And I would submit there are no cases that would stand for that proposition. The evidence about the hiring and termination practices of NWO is submitted and is also undisputed. They quibble with the level of detail. They apparently want details as to why every one of those terminations was made, exact ages. We don't have that, nor do we have any dispute, however, that that is, in fact, the hiring practice of NWO. The record doesn't have that. Was NWO asked to provide responses to that question? No, Your Honor. That issue was not requested in discovery. That was something that was put in there through Paula Miller's declaration because we had this notion that had been advanced in the case to that point that there was some kind of theory of an institutional bias on the basis of age. Ms. Halfridge's testimony about that. That would be good evidence. I mean, that's one of the ways counsel could get a genuine issue of fact. But she didn't seek that. That's correct, Your Honor. She mentions five specific employees and says, here's how I know that there was age bias. The company was trying to drive out older employees. She mentioned five people and five people only. Two of those people, upon deposition questioning, Ms. Halfridge admitted were not even terminated. Of the other three, she said she did not know virtually anything about the reasons for the termination. And Paula Miller's testimony fills in that gap as to why those other, at least two of those three, were terminated. One was because of a timekeeping and attendance problem. The other was because the employee was looking for a job while on the clock. For the period in question, you terminated more employees under 40 than over. Is that right? Correct, Your Honor. I'm out of time. Unless there are other questions, I will take my seat. I don't think so. Thank you, Mr. Flan. Thank you. Ms. Palfe. Addressing the terminations of younger employees first, one of the reasons that it wasn't asked for discovery is because the evidence wasn't produced until after discovery in connection with their motion for summary judgment. So at that point in time, discovery had closed. But there's a remedy, right? I mean, what is it, 56F or something that says, you know, discovery, we shouldn't have to continue to brief the summary judgment motions. Did you bring that motion? No, Your Honor, because what happens with other employees is not necessarily reflective of what happened in this particular instance. Ms. Helfrich discussed several older. You didn't see evidence to bolster the comparative argument? Not after summary judgment was filed, no, Your Honor. Ms. Helfrich brought forth evidence of older workers having questionable terminations, whether they were forced out in resignations or were involuntarily terminated. What defendant has failed to do is produce the evidence of those records showing us that those questionable terminations, based on Ms. Helfrich's testimony, were not questionable. Did you request that information or those records? Ms. Helfrich testified to it in her deposition, and defendant hasn't contradicted that testimony with records of those employees. In terms of evidence of any performance issues after the 30-day warning, we talked about the one instance in July of 2011 concerning overtime. The other incidence that defendant claims is evident of performance issues happened in September of 2011 with a new process titled bubbling. It's a new process. Ms. Helfrich testified to it in her deposition that it was a new process and that it was unclear whether it was her responsibility or Ms. Neely's responsibility or one of the newer, younger employees. And so Ms. Helfrich disputes that the email of September 8, 2011 shows any performance issues. And so after she completes the 30-day warning, there's no undisputed evidence that she had performance issues. And in terms of what NWO's counsel talked about in April and May, she was placed on the 30-day warning at the end of April, and she was taken off of it in May. And so NWO pointing to these other emails in May as evidence of performance issues, why would they take her off of the 30-day warning? If she continued to have performance issues, they could have terminated her or issued another 30-day warning. But it wasn't a problem back then, not until she filed this case, were these alleged performance issues apparent to defendant or anyone else. I believe I'm out of time. Okay. Thanks to both of you for your helpful oral arguments and briefs. We appreciate it. The case will be submitted, and the clerk may adjourn court.